# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| ARVIN RUSSELL, | ) |
| Plaintiff, | ) |
| v. | ) Case No. CV408-058 |
| WILLIAMS, *Warden*; THOMAS, *Deputy Warden*; DOCTOR FOGAM *Medical Director*; DOCTOR AWE, *Deputy Medical Director*; | ) |
| Defendants. | ) |

## **REPORT AND RECOMMENDATION**

Arvin Russell, currently an inmate at Valdosta State Prison, has filed a complaint pursuant to 42 U.S.C. § 1983 against several officials at Coastal State Prison alleging that they denied him necessary medical care for a serious medical condition. (Doc. 1.) For the reasons that follow, his complaint should be **DISMISSED**.

## I. LEGAL FRAMEWORK

The Prison Litigation Reform Act requires the federal courts to conduct early screening of all prisoner suits against governmental entities

or officials for the purpose of identifying claims that are subject to immediate dismissal as frivolous, malicious, or legally insufficient. 28 U.S.C. § 1915A (courts must identify "cognizable claims" filed by prisoners or other detainees and dismiss claims which are frivolous, malicious, fail to state a claim for relief, or seek monetary relief from a defendant immune from such relief); <u>see also</u> 42 U.S.C. § 1997e(c)(2) (allowing dismissal on the same four standards provided by § 1915A as to any prisoner suit brought "with respect to prison conditions"). The Court will therefore examine plaintiff's complaint to determine whether he has stated a colorable claim for relief under § 1983.

## II. BACKGROUND

Before being transferred to Coastal State Prison, Russell was an inmate at Baldwin State Prison. (Doc. 1 at 4.) The medical staff at Baldwin placed him on an antipsychotic drug called Risperdal. (<u>Id.</u>) Shortly thereafter, he was transferred to Coastal State Prison, where he first noticed a painful twitching in his neck. (<u>Id.</u>) He promptly sought medical attention. (<u>Id.</u>) A nurse gave him ibuprofen and scheduled him

to see a doctor. (Id.) Two weeks later, he saw Dr. Awe, who administered a Benadryl shot and prescribed additional ibuprofen. (Id.) The shot did not provide any relief, and Russell's condition further deteriorated. (Id. at 5.) He began to experience hot flashes and night sweats. (Id.) Now in severe pain, Russell once again sought medical attention. (Id.) When he arrived at the prison clinic, a nurse allegedly laughed at the twitch, but Russell was seen by a doctor who once again administered a Benadryl shot. (Id.) As before, the shot did little to ease the pain. Russell states that he could not "take a bath or lift anything without going through extreme pain," and "it was even difficult . . . to sleep." (Id.)

Russell filled out another medical request form, but he was not seen right away. (Id.) While awaiting his next appointment, Russell's "neck started locking up . . . causing so much pain" that he believed he might lose consciousness. (Id.) A prison guard had another inmate escort Russell to the prison's medical clinic. (Id.) Upon arrival, he was seen by a nurse, who told him that there was nothing wrong with him. (Id.) He continued to complain and was seen by a physician's assistant, who had an x-ray taken. (Id.) At some point, Dr. Awe became involved; he

ordered another Benadryl shot and scheduled an appointment to see Russell again three weeks later. (Id.)

At the appointment, Dr. Awe indicated that he believed that the muscle spasm was caused by the mental health medication given Russell at Baldwin State Prison. (Id.) Dr. Awe prescribed Cogentin to help with the twitch, and he told Russell that he would send him to Augusta Medical State Prison to be seen by a specialist. (Id.) As with the prior treatments, the Cogentin did not resolve the muscle spasm. (Id.) Consequently, while waiting to see the specialist, Russell submitted several more medical requests, but he was not seen for over a month. (Id.) He was finally seen by a nurse. (Id.) Russell explained his symptoms to her, and she took him to see Dr. Awe. (Id.) Dr. Awe told him to continue taking the Cogentin. (Id.) During "pill call," Russell asked the nurse why Dr. Awe continued to prescribe Cogentin when it was not helping his symptoms. (Id.) She told him that he was no longer on Cogentin; he was now taking Tylenol. (Id.)

Russell was finally seen by a specialist at Augusta Medical State Prison about five months after Dr. Awe's referral. (Id.) The specialist

prescribed Robaxin, recommended physical therapy, and said that Russell should have a followup with him in thirty days. (Id.) The Robaxin provided little relief, so upon returning to Coastal State Prison, Russell again began to submit medical request forms. (Id.) He saw a nurse, and when he asked her about his physical therapy, she told him his appointment was approaching. (Id. at 7.) She also set up another appointment for Russell to speak with a doctor. (Id.) Two weeks passed, but Russell was never called to the medical clinic. (Id.) He asked another nurse about the appointment. (Id.) Apparently, the appointment had been cancelled, so the nurse scheduled another one. (Id.) Russell also asked the nurse about the physical therapy; she informed him that he was not scheduled for therapy. (Id.)

Russell arrived for his appointment with Dr. Awe, who assured Russell that he would receive physical therapy and that he would be returned to the specialist for a followup. (Id.) Dr. Awe refused to give Russell any additional medication, instead waiting for the specialist to determine the next step in treatment. (Id.)

An "unreasonable time" later, Russell was once again transported

to Augusta Medical State Prison. (Id.) The specialist prescribed Baclofen and scheduled another followup appointment thirty days later. (Id.) Upon returning to Coastal State Prison, Russell was still in severe pain, so he once again began to barrage the medical staff with medical requests. (Id. at 8.) Dr. Awe saw Russell some time later. (Id.) He took Russell off of Robaxin and prescribed Ultram for the pain. (Id.) The doctor once again assured Russell that he would eventually receive physical therapy. (Id.)

Some time later, Russell was again transported to see the specialist at Augusta Medical State Prison. The specialist administered four Botox injections and prescribed Darvocet for the pain. (Id.) He scheduled Russell for a followup appointment three months later. (Id.) Russell also informed the specialist that he never received physical therapy at Coastal State Prison. (Id.) The specialist's assistants told Russell that Coastal State does not provide physical therapy on site, so he would have to be transported to a different facility where it is available. (Id.)

Upon returning to Coastal, Russell "suffered in pain for over a week" before realizing that he was not receiving Darvocet. (Id.) He filled

out another medical request form and was once again seen by Dr. Awe. (Id.) Dr. Awe was hesitant to provide Darvocet, as it is a controlled substance. (Id. at 8-9.) He told Russell that Dr. Fogam, the prison's medical director, would have to approve both the Darvocet and physical therapy. (Id.) Dr. Awe again prescribed Ultram to ease Russell's pain, but the pain persisted. (Id. at 9.) Russell continued to submit medical request forms and was seen several times by the medical staff. (Id.) They continued to give him the runaround regarding physical therapy. (Id.) At one point, he saw a female doctor, who wrote another physical therapy order. (Id.) Russell then met with his mental health doctor, who informed him that he was over a month past due to see the specialist in Augusta. (Id.)

Russell finally met with Dr. Fogam regarding the specialist's orders for Darvocet and physical therapy. (Id. at 10.) Fogam told Russell that Darvocet was out of the question, and he denied Russell physical therapy because it "cost[s] money" and would be unlikely to provide any relief. (Id.)

Russell asks the Court to award him compensatory and punitive

7

damages. (Id. at 13.) He also requests a jury trial. (Id.)

## III. ANALYSIS

Russell asserts that defendants were deliberately indifferent to his medical needs and unjustifiably delayed his medical treatment and denied him necessary medical care. (Id.)

### A. Deliberate Indifference

To state a constitutional claim for the deprivation of necessary medical care, a plaintiff must show that prison officials acted with "deliberate indifference" to his "serious" medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Even assuming that the muscle spasm he describes qualifies as an objectively "serious" medical need, Russell has failed to show that the prison's wardens or any members of its medical staff were deliberately indifferent to that need.

Looking first to Russell's claims against the wardens, the Court notes that claims brought pursuant to § 1983 cannot be based upon theories of vicarious liability or respondeat superior. Polk County v. Dodson, 454 U.S. 312, 325 (1981); Monell v. Dep't of Soc. Servs., 436 U.S.

658, 691 (1978). Thus, Russell cannot recover from the wardens simply because of their positions as supervisors at the prison. Rather, he must demonstrate either that the wardens directly participated in the alleged constitutional deprivation or that there is some other causal connection between their acts or omissions and the alleged constitutional deprivation. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988) (per curiam).

There are no allegations in the complaint indicating that either warden directly participated in the alleged constitutional deprivation. Russell states that they were on notice of the problem and did nothing to correct it. (Doc. 1 at 11.) But it is not enough that they be on notice that Russell had a medical condition and was not pleased with his treatment by the medical staff. Rather, Russell must allege facts showing that those defendants were themselves deliberately indifferent to his medical needs. That requires a showing that the defendants actually recognized that the treatment being provided by the prison medical staff was so woefully inadequate as to create "a substantial risk of serious harm" to Russell's health. Farmer v. Brennan, 511 U.S. 825, 837 (1994) (prison officials

must "draw the inference" that a "substantial risk of serious harm exists" to plaintiff's health or safety). There are no facts alleged in the complaint indicating that these defendants recognized that the prison medical staff was providing inadequate care for Russell's medical problems or that a failure to provide additional or different treatment would likely result in serious harm. For instance, Russell provides no indication that either warden had reason to believe that his muscle spasm was substantially likely to cause him serious injury or severe pain absent a radical change in his medical care.

Absent direct participation, a causal connection may be established by showing that a supervisory official implemented or allowed to continue an official policy or an unofficially adopted policy or custom under which the violation occurred. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986); Fundiller v. Cooper City, 777 F.2d 1436, 1442 (11th Cir. 1985). A plaintiff must show that the supervisor's knowledge amounted to deliberate indifference to the asserted harm or risk, in that his knowledge was "so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v.

Jefferson County Comm'n, 10 F.3d 1535, 1541-42 (11th Cir. 1994) (Kravitch, J., concurring). At no point in the complaint is there any indication that the wardens implemented such a policy or winked at some custom or practice of furnishing inadequate medical care to inmates. Consequently, Russell's claim of denial of necessary medical care against defendants Williams and Thomas should be dismissed.

Similarly, Russell's claims against Doctors Fogam and Awe, fail to state a claim for relief. Russell provides no facts indicating that Fogam or Awe acted with the level of disregard required to state a claim under the Eighth Amendment as to Russell's treatment at Coastal or the decision to disregard the specialist's orders. Adams v. Poag, 61 F.3d 1357, 1543 (11th Cir. 1995) ("[I]t is obdurancy and wantonness, not inadvertence or error in good faith," that violates the Constitution in "supplying medical needs.") (citation omitted).

The complaint reveals that the doctors routinely and unbegrudgingly provided Russell with medical treatment over an extended period of time, undercutting any claim that they exhibited the obdurancy or wantonness that defines a deliberate indifference claim.

Furthermore, regarding the decision to disregard the specialist's orders for physical therapy and Darvocet, doctors sometimes disagree about what treatment is necessary or beneficial to a patient. Where such a decision hinges on medical judgment, it simply cannot establish that the doctor was deliberately indifferent to plaintiff's serious medical needs. Upon meeting with Russell, Dr. Fogam stated that he did not believe physical therapy would help Russell.[1] (Doc. 1 at 10.) He also indicated that the prescription for Darvocet had expired, and he did not wish to prescribe it again because, like the physical therapy, he believed that it was not going to work. (Id.) Dr. Fogam considered the proposed course of treatment, but he disagreed with it. At most, the decision to depart from the specialist's orders constituted medical malpractice, and a § 1983 claim "does not lie if a prisoner's complaint is directed at the wisdom or quality of the medical treatment he received in prison, even if that treatment is so negligent as to amount to medical malpractice." Brinton v. Gaffney, 554 F. Supp. 388, 389 (E.D. Pa. 1983). Indeed, "even gross negligence" is insufficient to establish liability under § 1983. Miller v.

---

[1] Dr. Awe deferred to the medical director, Dr. Fogam, in making the determination.

King, 384 F.3d 1248, 1251 (11th Cir. 2004). Consequently, Russell's claim against these defendants should be dismissed.

B. **Delay in Treatment**

Plaintiff next contends that the defendants unnecessarily delayed his access to medical care. (Id. at 4-12.) A delay in access to medical care can state a claim under the Eighth Amendment when the delay is "tantamount to 'unnecessary and wanton infliction of pain.'" Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quoting Estelle, 429 U.S. at 104). The Court must consider the nature of the medical need and the reason for the delays in determining whether the delays amounted to deliberate indifference and violated the inmate's constitutional rights. Farrow v. West, 320 F.3d 1235, 1247 (11th Cir. 2003) (citing Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994)).

Numerous cases have found officials liable as a result of their delay in providing a plaintiff with needed medical care. See, e.g., Brown, 894 F.2d at 1538 (unexplained six-hour delay in medical treatment for a broken foot); Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir.

1988) (individual in automobile accident was in obvious need of medical attention because of his deteriorating condition); H.C. ex rel. Hewett v. Jarrard, 786 F.2d 1080, 1086-87 (11th Cir. 1986) (three-day delay in treatment for a shoulder injury was excessive); Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 702 (11th Cir. 1985) (four-month delay in treatment for leukemia-related symptoms); Aldridge v.Montgomery, 753 F.2d 970, 972 (11th Cir. 1985) (per curiam) (two-and-a-half hour delay in treatment for bleeding from a one-and-a-half-inch cut over detainee's eye). In cases where the court has found that delays of days or hours were unacceptable, the inmate's medical condition was so grave that he required immediate medical attention. Farrow, 320 F.3d at 1247. Where the injury is not so severe, however, a considerable delay in treatment does not automatically rise to the level of a constitutional violation. Id. "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." Harris, 21 F.3d at 393-94.

The delays described by Russell in his complaint simply do not amount to deliberate indifference. This is not one of those cases where

prison officials did nothing or next to nothing to address Russell's emergency medical needs. Russell was *regularly* treated for his illness, and it is well settled that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop, 871 F.2d at 1035. Although many of his appointments were scheduled more than two weeks out, when the appointment did not arrive quickly enough to suit Russell or where his pain symptoms worsened, prison officials quickly took him to the prison's medical clinic for prompt treatment. (Doc. 1 at 5.) Furthermore, even an extremely severe muscle spasm is unlikely to permanently harm or kill a person. If the Court were to require all such complainants to be seen and treated with the urgency Russell desires, then prison medical facilities would be held to a higher standard than facilities available to the unincarcerated public.

Russell finally alleges that the medical staff regularly delayed providing him his medications when he finished the medicine provided him. (Id. at 11.) He states that he often went more than a week at a time without his prescriptions. (Id.) Nowhere in the complaint, however, does Russell indicate which defendant failed to provide him his prescriptions

on time. Nor does he allege that any defendant deliberately or callously denied him necessary medications. Russell simply does not satisfactorily allege that defendants acted with deliberate indifference towards his medical needs.

## IV. CONCLUSION

For all of the above reasons, Russell's complaint should be **DISMISSED** for failure to state a claim.

**SO REPORTED AND RECOMMENDED** this 23rd day of May, 2008.

/s/ G.R. Smith
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA